UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| VANTAGE TRAVEL SERVICE, INC. ) | |
| ) | Case No. 23-11060-JEB |
| Debtor. ) | |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
AUTHORIZING SECURED FINANCING PURSUANT TO 11 U.S.C. § 364(d)
AND USE OF CASH COLLATERAL, AND RELATED RELIEF**
**[Request For Emergency Determination By July 5, 2023 For Interim Relief]**

Vantage Travel Service, Inc. (the "Debtor") hereby moves this Court on an emergency basis, pursuant to Sections 363 and 364(d) of the Bankruptcy Code, Fed. R. Bankr. P. 4001, and MLBR 4001-2 and 9013-1(g), for: (i) *an interim order entered on or before July 5, 2023* authorizing the Debtor, pending the final hearing on this Motion, to use cash collateral and obtain secured post-petition financing in an amount up to $440,895 for the payment of operating and administrative expenses in accordance with the 13-week cash flow budget attached as Exhibit A (the "Budget") and the proposed Interim Order attached as Exhibit B (the "Interim Order"); and (ii) a final order entered by July 21, 2023 authorizing the Debtor to use cash collateral and to obtain post-petition secured financing in an aggregate amount of up to $1,000,000 in accordance with the Budget and this Court's final order approving such financing arrangements substantially in the form of the Interim Order, the proposed form of which will be filed by the Debtor at least two (2) business days before the final hearing on this Motion (the "Final Order"). **As set forth in greater detail below, to avoid immediate and irreparable harm to the Debtor's estate, the Debtor requires immediate funding of its ongoing, ordinary course business obligations, including employee payroll to be paid on Friday, July**

**7, 2023, that must be funded through a deposit into the Debtor's payroll account by no later than Thursday, July 6, 2023, and retainers for its bankruptcy counsel ($110,000) and financial advisor ($15,000). Accordingly, the Debtor requests that this Court schedule an emergency hearing on or before July 5, 2023 to consider the interim relief requested by this Motion**. **Altogether, the Debtor projects that it will require $440,895 in authorized interim financing through July 21, 2023, the date by which the Debtor seeks entry of the Final Order.**

The proposed debtor-in-possession financing of $1,000,000 is to be provided by two lenders: (i) United Travel Pte. Ltd., a Singapore corporation ("Purchaser"), which has agreed to acquire the Debtor's business operations and assets pursuant to its asset purchase agreement with the Debtor that is the subject of the Debtor's sale motion filed concurrently herewith, and (ii) the Henry R. Lewis Trust dated November 24, 2004 (the "HRL Trust" and, together with Purchaser in their postpetition lender capacities, the "DIP Lenders"). The HRL Trust is also, together with Henry R. Lewis, the Debtor's prepetition secured lender (the "Prepetition Lender"). Purchaser has agreed to provide up to $750,000 of postpetition financing, including the first $500,000 to be advanced to the Debtor. The HRL Trust has agreed to provide up to $250,000 of postpetition financing, with its advances to be made in amounts equal to the Purchaser's advances after the Purchaser has advanced its first $500,000 of financing. The proposed financing will be made on the terms and conditions set forth in the Debtor's promissory notes to each of the DIP Lenders, comprised of the note to Purchaser attached as Exhibit C (the "Purchaser DIP Note") and the note to the HRL Trust attached as Exhibit D (the "HRL Trust DIP Note" and, together with the Purchaser DIP Note, the "DIP Notes"), and will be, in each case, subject to the terms and

conditions set forth in the Interim Order and the Final Order once such orders are entered. The DIP Notes and the Interim Order are discussed in greater detail in Section V below.

This Motion is supported by the Declaration of Gregory DelGreco in Support of First Day Motions (the "DelGreco Declaration") and the Declaration of Lawton W. Bloom in Support of Debtor's Financing Motion (the "Bloom Declaration"), each of which is being filed concurrently herewith. As grounds for this motion, the Debtor states as follows:

## I. Background

1. On June 29, 2023 (the "Petition Date"), the Debtor filed a voluntary petition with this Court commencing this Chapter 11 case. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to manage its business and financial affairs as a debtor-in-possession. No creditors' committee has yet been appointed.

2. The Debtor was founded in 1983, and has since that time grown to become one of the country's most recognized travel agencies providing deluxe international tours. Since its inception, the Debtor has provided travel experiences to more than 500,000 travelers, offering at its pre-pandemic height 65 tours and more than 500 departures annually. Its travel offerings include trips on river and ocean-going vessels owned by affiliated, non-debtor entities, as well as river, ocean-going and land-based tours booked with third-party operators.[1]

---

[1] Those entities are: HRL European River Cruise Ventures II, GmbH, the owner of the river vessel Splendor; HRL River Cruise Venture III, GmbH, the owner of the river vessel Venture; HRL Bahama Holdings Ltd. the holder of a 60% interest in the entity owning the ocean-going vessel Odyssey, and a 55% interest in the entity that owns the ocean vessel Explorer (together, the "Ship-Owning Affiliates").

3

3. The Debtor's headquarters are located in Boston, Massachusetts. The Debtor interacts with its customers primarily by telephone and through the Debtor's website. Prior to downsizing its workforce before filing its bankruptcy petition, the Debtor employed approximately 70 individuals in the United States, of which approximately 70 percent were affiliated with the Debtor's Boston office and the remainder located around the country, working remotely. The Debtor conducted its off-shore operations with the assistance of several non-U.S. individuals through independent contractor agreements or equivalent contractual arrangements. Due to cash flow constraints, the Debtor terminated all but five of its employees on June 20, 2023.[2]

4. As was the case throughout the travel industry, COVID-19 had a substantial impact on the Debtor's operations. Tour revenues declined from $132 million in 2019 to just over $10 million in 2020—a decline of over 92 percent. At the same time, the Debtor's losses in 2020 alone exceeded $29 million. While revenue rebounded somewhat in subsequent years, it remained well below the Debtor's pre-pandemic levels, resulting in continuing losses despite the Debtor's attempts to down-size operations and reduce costs.

## II. Proposed Sale

5. In response to the financial difficulties faced by the Debtor and the Ship-Owning Affiliates, a decision was made to explore a sale of, or financing for, the Debtor, the Ship-Owning Affiliates, and/or several other travel-related affiliates of the Debtor. In August 2021, several of these non-Debtor entities engaged Gordian Group, LLC ("Gordian"), a well-known

---

[2] The Purchaser is aware of this downsizing, which occurred prior to the execution of the APA, and has nonetheless committed to the purchase of the Assets, after which it will presumably execute its own plan for fulfilling the staffing needs of the acquired business.

and highly reputable investment banking firm with particular expertise dealing with distressed companies.  The retention of Gordian commenced a vigorous, 18-month marketing process, through which the potential market for sources of financing or purchasers for the Debtor and its affiliates was thoroughly explored.  A key objective of the process was to find a prospective buyer or funding source that would support the Debtor's ability to mount tours that had been paid for, in whole or in part, by its customers. As detailed in the Declarations of Gregory DelGreco and David L. Herman, filed concurrently herewith, a term sheet was executed with the Purchaser that contemplated a purchase of all of the common stock of the Debtor.  For the reasons detailed in the declarations, that transaction was not consummated. Ultimately, the Debtor's negotiations with the Purchaser—one of the potential buyers sourced by Gordian—did result in a proposed transaction contemplating an acquisition of most of the Debtor's assets through a Section 363 sale.  The terms of that transaction are as set forth in the Asset Purchase Agreement between the Debtor and Purchaser (the "APA") that is the subject of the Debtor's sale motion filed concurrently herewith, by which motion the Debtor seeks approval of the sale transaction contemplated by such agreement (the "Proposed Sale").

### III.  Existing Secured Debt

6.      As of the Petition Date, the Debtor's sole secured creditors (other than minor office equipment leases) are Henry R. Lewis and the HRL Trust (together, the "Prepetition Lender"), who together were owed approximately $35 million as of the Petition Date.  The Debtor's indebtedness to the Prepetition Lender (the "Prepetition Obligations") is evidenced, governed and/or secured by (i) the Fourth Amended and Restated Promissory Note, dated April 25, 2023, by Vantage in favor of the Prepetition Lender, in the original principal amount of

$35,000,000.00 (together with all prior amendments restatements, supplements and other modifications thereto, the "Note"), (ii) that certain Security Agreement, dated December 22, 2021, by Borrower in favor of Paul Gauguin Shipping Limited, a Cayman Islands limited company indirectly owned by Henry R. Lewis (the "Original Lender")[3] (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "Security Agreement"), and (iii) UCC-1 financing statements filed with the Secretary of State of the Commonwealth of Massachusetts (the "Financing Statements" and, together with the Note, the Security Agreement and all other documents, instruments and agreements securing and/or evidencing the Prepetition Obligations, the "Prepetition Loan Documents").

7. The Prepetition Lender's security interest in the Debtor's personal property is subject to purchase money security interests ("PMSI") held by two entities that financed the Debtor's acquisition of certain equipment, including Lenovo Financial Services (computers and related equipment) and Xerox Financial Services (copiers). The Debtor believes that it has fully satisfied its obligations to Lenovo. The copiers financed by Xerox are not included in the assets to be acquired by Purchaser, and the Debtor expects that Xerox will pursue its secured creditor remedies with respect to its collateral.

### IV. Financing Needs

8. In order to be able to operate its business during this Chapter 11 case and pay its Chapter 11 administrative expenses, the Debtor requires financing, a need that is particularly

---

[3] On or about October 12, 2022, the Original Lender assigned to the Prepetition Lender all of the Original Lender's right, title, and interest in, to, and under an earlier version of the Note and the Security Agreement pursuant to that certain Assignment and Assumption Agreement, dated October 12, 2022, by and among Original Lender, the Trust, and Mr. Lewis.

acute because of the Debtor's current inability to generate revenues through the operation of tours and charters. The DIP Lenders and the Prepetition Lender have agreed, pursuant to the DIP Notes and the Prepetition Lender's consent thereto, to permit the Debtor's use of the Prepetition Lender's cash collateral and to provide up to $1,000,000 of secured postpetition financing to the Debtor, all for the purposes and in the amounts set forth in the Budget. This financing will enable the Debtor to meet payroll, pay utilities, and pay its other operating and administrative expenses while it develops and seeks Court approval of the Proposed Sale. Without such financing, the Debtor would be unable to pursue the Proposed Sale and would be forced to liquidate, to the detriment of its creditors.

9. By this motion, the Debtor seeks authority pursuant to Sections 363 and 364(d) of the Bankruptcy Code to use the Prepetition Lender's cash collateral and to obtain up to $1,000,000 of secured postpetition financing from the DIP Lenders, to be used to pay the Debtor's ongoing expenses in accordance with the Budget. ***The Debtor requires immediate authority to borrow up to $440,895 pending the final hearing on this motion, in order to meet its obligations including employee payroll to be paid on Friday, July 7, 2023 and that must be funded through a deposit into the Debtor's payroll account by no later than Thursday, July 6, 2023, and retainers for its bankruptcy counsel ($110,000) and financial advisor ($15,000)***. The Debtor currently expects that such interim relief will enable the Debtor to continue to meet its expenses pending a final hearing on this motion, so long as the final hearing is conducted by no later than July 21, 2023.

### V. Summary of the DIP Notes and the Interim Order[4]

10. The essential terms of the DIP Notes and the Interim Order are summarized below, commencing with a description of the Purchaser DIP Note. The HRL Trust DIP Note is in essentially the same form as the Purchaser DIP Note, and the below summary will describe the ways in which its provisions vary from the HRL Trust Note.[5] The Interim Order provides authority for the Debtor to borrow pursuant to the DIP Notes, and contains other terms and conditions governing the proposed financing, including with respect to the Prepetition Lender and its prepetition blanket security interest in the Debtor's assets.

*Purchaser DIP Note—Essential Terms and Conditions*

- Loan Facility; Interest; Expenses. The Purchaser has agreed to lend the Debtor up to $750,000, including an initial advance of up to $500,000 to be made prior to any advances by the HRL Trust under the HRL Trust DIP Note, and up to an additional $250,000 to be made in weekly advances (as needed, in accordance with the Budget) on a 50/50 sharing basis with the HRL Trust. [*Purchaser DIP Note, at § 1*] Loan advances will bear interest at the rate of five percent (5%) per annum, and after an "Event of Default" will bear interest at the default rate of eight percent (8%) per annum. [*Purchaser DIP Note, at § 4*] **The Debtor has agreed to pay the Purchaser's expenses relating to the Purchaser DIP Note on the Maturity Date (described below) or on demand. [*Purchaser DIP Note, at § 8*]**

- Conditions Precedent to Loan Advances. Entry of the Interim Order, execution of the Purchaser DIP Note, and absence of any event of default are conditions precedent to the Purchaser's obligation to make the initial loan advance pending the final hearing on the Debtor's financing motion. Thereafter, weekly advances require satisfaction of several conditions precedent, including entry of the final order authorizing the Debtor's borrowing, entry of an order approving the sale procedures for the Proposed Sale, continued effect of the APA, and lack of any Event of Default, all as more particularly set forth in *Section 2* of the Purchaser DIP Note.

---

[4] Where the provisions of the DIP Notes and the Interim order vary from the requirements of MLBR 4001-2(c), those provisions are set forth in bold type.

[5] In addition to the differences in the terms of the two DIP Notes discussed below, in the Event of Default, the rights of Purchaser to recover amounts due under the Purchaser DIP Note from its collateral shall be senior to the rights of the HRL Trust under the HRL Trust DIP Note.

8

- **Maturity; Prepayments.** The Purchaser DIP Note is payable in full, including accrued interest and fees upon the "Maturity Date." [*Purchaser DIP Note, at §§ 3, 5*] The "Maturity Date" is the earliest to occur of (i) August 16, 2023, (ii) the date that is 21 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (iii) the date upon which the Debtor consummates the Proposed Sale (or other sale of all or substantially all of its assets; (iv) the date upon which any plan of reorganization for the Debtor becomes effective, (v) the date on which the obligations under the Purchaser DIP Note are accelerated following an Event of Default, or (vi) the entry of an order of the Bankruptcy Court dismissing the Debtor's Chapter 11 case or converting such case to a case under Chapter 7 of the Bankruptcy Code. [*Purchaser DIP Note, at Exh. B, "Maturity Date"*] The Purchaser DIP Note permits prepayment in minimum $100,000 increments, and requires prepayment in certain circumstances, including borrowings in excess of the Purchaser's $750,000 funding commitment or from proceeds of sale of any of the Debtor's assets. [*Purchaser DIP Note, at §§ 6, 7*] If Purchaser is the successful bidder to acquire the Debtor's assets pursuant to the Proposed Sale, the Debtor expects that the Purchaser DIP Note obligations will be satisfied through a purchase price credit at the closing of the sale transaction. [*Purchaser DIP Note, at § 3*]

- **Postpetition Liens; Priority of Liens and Obligations.** To secure repayment of the Purchaser DIP Note, the Debtor will grant the Purchaser a first priority lien and security interest in all of the Debtor's property (the "Purchaser DIP Lien"), *except that the Purchaser DIP Lien will not extend to avoidance actions under Chapter 5 of the Bankruptcy Code, which are preserved for the benefit of the Debtor and its bankruptcy estate.* [*Purchaser DIP Note, at § 10*] **The Purchaser DIP Lien shall be senior to other claims and liens against the Debtor's assets whether created prepetition or postpetition (including the Prepetition Lender's prepetition liens), except for the PMSI. [*Purchaser DIP Note, at § 11*]** The Purchaser will also have a superpriority administrative claim for its loan advances under the Purchaser DIP Note. [*Purchaser DIP Note, at § 11*] The Purchaser's liens and superpriority administrative claim will be subject to the Carve-Out set forth in the Interim Order (and the Final Order), as discussed below. [*Purchaser DIP Note, at § 11*] The Purchaser DIP Lien shall be deemed perfected without need for the filing of a financing statement, pursuant to the Interim Order and the Final Order. [*Purchaser DIP Note, at § 12*]

- **Debtor's Representations and Covenants; Proposed Sale Milestones.** The Purchaser DIP Note contains a number of representations and covenants of the Debtor, many of which are customary to loan transactions outside of bankruptcy and several of which are particular to the Debtor's Chapter 11 case and the Proposed Sale. These representations and covenants are set forth in *Sections 13 – 15* of the Purchaser DIP Note. Notably, with respect to the Proposed Sale and the financing to be provided by the Purchaser to achieve it, the Debtor has agreed to take all actions necessary achieve the following events (the "Milestones"): (i) entry of the Interim Order within six (6) days after the petition date; (ii) entry of an order approving the sale procedures for the Proposed Sale within six (6) days after the petition date; (iii) conduct of an auction among the Purchaser and any qualified competing bidders within 36 days after the

9

Petition Date; (v) entry of an order approving the Proposed Sale within 41 days after the Petition Date; and (vi) closing of the Proposed Sale within 46 days after the Petition Date. [*Purchaser DIP Note, at § 14(l)*]  Significant bankruptcy-related covenants include the Debtor's agreement not to pay prepetition liabilities absent court order, to assert claims against the Purchaser with respect to the Debtor's loan obligations to the Purchaser, or to seek dismissal or conversion of the Debtor's Chapter 11 case.  [*Purchaser DIP Note, at § 15*]

- Events of Default; Purchaser Remedies.  The Purchaser DIP Note contains at *Section 17* thereof numerous "Events of Default" including the following most salient Events of Default:  (i) the Debtor's failure to pay when due any Purchaser DIP Note obligation; (ii) the Debtor's failure to comply with the requirements of the Interim Order or the Final Order; (iii) the Debtor's failure to meet any of the Milestones; (iv) the Debtor's unauthorized use of loan proceeds; (v) the entry of an order of the Bankruptcy Court converting or dismissing the Debtor's Chapter 11 case; (vi) the Debtor's request for appointment of a trustee, or appointment of a trustee; and **(vii) the Debtor's attempt to subject any of the Purchaser's collateral subject to the Purchaser DIP Lien to assessment pursuant to Section 506(c) of the Bankruptcy Code**.  Upon the occurrence of such an Event of Default, the Purchaser may (i) terminate its lending commitment, (ii) accelerate payment of all Purchaser DIP Note obligations, and (iii) exercise its rights and remedies under its loan documents and applicable law (subject to the automatic stay, from which the Purchaser would have the right to seek relief). [*Purchaser DIP Note, at § 18*]

- Miscellaneous.  The Purchaser DIP Note contains other terms and conditions customary to a debtor-in-possession loan agreement of the type involved, including customary representations and warranties and affirmative and negative covenants (in addition to those highlighted above), indemnification, and other provisions, addressing such matters as corporate authority, financial reporting, compliance with laws, restrictions on asset sales, choice of law, and other matters.  For a thorough understanding of these matters, it is recommended that one review the attached Purchaser DIP Note in its entirety.

### *HRL Trust DIP Note—Essential Terms and Conditions*

As noted, the HRL Trust DIP Note is modeled on the Purchaser DIP Note and contains most of the same substantive provisions.  A summary of the HRL Trust DIP Note, focusing on the chief differences from the Purchaser DIP Note and an explanation of the interplay between the Purchaser DIP Note and the HRL Trust DIP Note, is set forth below:

- Loan Facility; Interest; Expenses.  The HRL Trust has agreed to lend the Debtor up to $250,000 pursuant to weekly advances to be made on a 50/50 sharing basis with the Purchaser. [*HRL Trust DIP Note, at § 1*]  Loan advances will bear interest at the rate of five

10

percent (5%) per annum, and after an "Event of Default" will bear interest at the default rate of eight percent (8%) per annum. [*HRL Trust DIP Note, at § 4*]  **The Debtor has agreed to pay the HRL Trust's expenses relating to the HRL Trust DIP Note on the Maturity Date (described below) or on demand.  [*HRL Trust DIP Note, at § 8*]**

- <u>Conditions Precedent to Loan Advances</u>.  The HRL Trust shall not be obligated to make advances until after entry of the Final Order and Purchaser's full advancement to the Debtor of the initial $500,000 advance called for by the Purchaser DIP Note.  Advances are also conditioned on satisfaction of several conditions precedent, including entry of an order approving the sale procedures for the Proposed Sale, continued effect of the APA, and lack of any Event of Default, all as more particularly set forth in *Section 2* of the HRL Trust DIP Note.

- <u>Maturity; Prepayments</u>.  The HRL Trust DIP Note contains essentially the same payment on maturity, payment on default, and prepayment provisions as the Purchaser DIP Note.  [*HRL Trust DIP Note, at §§ 3, 5, 6, 7*]

- <u>Postpetition Liens; Priority of Liens, Obligations, Payments</u>.  To secure repayment of the HRL Trust DIP Note, the Debtor will grant the HRL Trust a first priority lien and security interest in all of the Debtor's property that is co-extensive with the Purchaser DIP Lien, and the HRL Trust shall also have a superpriority administrative claim for its loan advances under the Purchaser DIP Note on equal footing with the superpriority administrative claim provided to the Purchaser, in each case subject to the Carve-Out.  [*HRL Trust DIP Note, at §§ 10, 11*]  As between the Purchaser and the HRL Trust, the Debtor's obligations to the Purchaser will be satisfied prior to the Debtor's obligations to the HRL Trust.  [*HRL Trust DIP Note, at § 19*]

- <u>Debtor's Representations and Covenants</u>.  The HRL Trust DIP Note contains numerous representations and covenants of the Debtor, all of which are identical to or substantially consistent with those made by the Debtor pursuant to the Purchaser DIP Note.  [*HRL Trust DIP Note, at §§ 13 – 15*]

- <u>Events of Default; HRL Trust Remedies</u>.  The HRL Trust DIP Note contains at *Section 17* thereof numerous "Events of Default" that track those set forth in the Purchaser DIP Note.  Upon the occurrence of such an Event of Default, the HRL Trust may (i) terminate its lending commitment, (ii) accelerate payment of all HRL Trust DIP Note obligations, and (iii) exercise its right and remedies under its loan documents and applicable law (subject to the automatic stay, from which the HRL Trust would have the right to seek relief).  [*HRL Trust DIP Note, at § 18*]

- <u>Administrative Expense Coverage</u>.  To ensure that the Debtor has sufficient funds to pay administrative expenses of the Debtor's bankruptcy case in accordance with the Budget notwithstanding an unsuccessful sale process or other reason for termination of the HRL Trust's lending commitment, the HRL Trust has agreed to provide funds necessary to

11

pay such administrative expenses accrued in accordance with the Budget through the week during which the HRL Trust terminates its lending commitment. Specifically, the HRL Trust Note contains the following provision:

> ***Notwithstanding any provision, term, or condition of this Agreement, and notwithstanding any termination by the [HRL] Trust DIP Lender of its lending obligations after an Event of Default, the [HRL] Trust DIP Lender shall be obligated and agree to make loan advances to the Debtor necessary to enable the Debtor to pay all administrative expenses of the Debtor's Chapter 11 case that have accrued in accordance with the Budget (including Permitted Variances) through the end of the week in which the [HLR] Trust DIP Lender terminates its lending obligations under this Agreement***.
> [*HRL Trust DIP Note, at § 18*]

- Miscellaneous. The HRL Trust DIP Note contains other terms and conditions customary to a debtor-in-possession loan agreement of the type involved, and all such terms and conditions are identical to substantially equivalent to those corresponding terms and conditions set forth in the Purchaser DIP Note. For a thorough understanding of these matters, it is recommended that one review the attached HRL Trust DIP Note in its entirety.

*Interim Order—Essential Terms and Conditions*

The Interim Order provides for approval of the DIP Notes and authorizes the Debtor's borrowings thereunder, and contains certain additional terms and conditions governing the financing arrangements and related matters. The significant provisions of the Interim Order include:

- Debtor's Stipulations Regarding Prepetition Obligations. **The Debtor acknowledges that: (i) it is indebted to the Prepetition Lender for the Prepetition Obligations, including accrued and hereafter accruing interest and the reasonable costs and expenses (including attorneys' fees) incurred by the Prepetition Lender; (ii) the Prepetition Lender holds a valid and perfected first priority lien and security interest in substantially all of the Debtor's assets, including cash collateral; (iii) it has no offsets, defenses, or counterclaims to any of the Prepetition Obligations or to any of the Prepetition Lender's prepetition liens and security interests, and no portion of such prepetition liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable, contractual or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtor will not seek to prime the post-petition liens to be granted to the**

**DIP Lenders pursuant to the DIP Notes, the Interim Order, and the Final Order.  [***Interim Order, at ¶ F]*

- Findings to Support Financing.  The Interim Order contains numerous findings of the Bankruptcy Court to support the Debtor's borrowing under the DIP Notes, including that the Debtor has an immediate need for financing, that the Budget reasonably projects  the Debtor's borrowing needs for the period it covers, that the DIP Notes represent the Debtor's only means of financing its Chapter 11 case to pursue the Proposed Sale, and that good cause exists to authorize the requested financing on the terms and conditions of the DIP Notes.  [*Interim Order, at ¶¶ G, H*]

- Approval of Financing Arrangements.  The Interim Order: (i) approves the DIP Notes; (ii) authorizes the Debtor to obtain postpetition secured financing in accordance with the DIP Notes; (iii) confirms and authorizes the Debtor's grant of first priority liens and security interests in substantially all of the Debtor's assets (excluding avoidance actions under Chapter 5 of the Bankruptcy Code) to secure the Debtor's performance of the DIP Notes; (iv) approves the granting of superpriority administrative expense status to the DIP Lenders' claims; (v) authorizes the Debtor's use of the Prepetition Lender's cash collateral; and (vi) provides adequate protection to the Prepetition Lender with respect to such use of its cash collateral.  [*Interim Order, at ¶¶ 2 – 8, 13, and 15*]

- Events of Default; DIP Lender Remedies.  The Interim Order incorporates the "Events of Default" from the Purchaser DIP Note, and confirms the Purchaser's default remedies set forth in the Purchaser DIP Note.  [*Interim Order, at ¶¶ 21, 22*]

- Carve-Out for Budgeted Expenses, Estate Professionals' Allowed Compensation, and Quarterly Fees.  Notwithstanding (i) the occurrence of an Event of Default, and (ii) any provision of the DIP Notes or the Interim Order, the DIP Lenders' liens and security interests, any superpriority administrative claim that may be granted to the DIP Lenders, and the Debtor's waiver of rights under 11 U.S.C. § 506(c) in favor of the DIP Lenders shall be subject to a carve-out (the "Carve-Out") necessary to pay (i) unpaid fees of the Clerk of the Court and of the U.S. Trustee pursuant to 28 U.S.C. § 1930; (ii) unpaid fees and expenses of the professionals of the Debtor and any Committee retained by an order of the Court pursuant to Section 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Professionals") incurred prior to written notice by either DIP Lender to counsel to the Debtor of the occurrence of an Event of Default (the "Trigger Date"), to the extent such fees and expenses are (a) within the amounts set forth in the Budget approved by the DIP Lender for such period, (b) subsequently allowed by the Court under Sections 330, 331 or 363 of the Bankruptcy Code, and (c) not otherwise payable from retainers or any professional expense escrow account established by the Debtor; and (iii) fees and expenses of the Professionals incurred after the Trigger Date in an aggregate amount not to exceed $25,000, to the extent such fees and expenses are (a) subsequently allowed by the Court under Sections 330, 331 or 363 of the Bankruptcy Code, and (b) not otherwise payable from retainers or any professional expense escrow account established by the Debtor.  Pending the

Trigger Date, the Debtor shall be authorized to fund, on a weekly basis, an escrow account for the payment of Professionals in an amount up to the amount set forth in the Budget for that week. [*Interim Order, at ¶ 24*]

- Creditors' Right to Challenge the Prepetition Obligations and Liens. Notwithstanding the Debtor's acknowledgements and waivers concerning the Prepetition Obligations and the Prepetition Lender's liens and security interests, any objection to such prepetition claims and liens may be filed (i) by any party within 75 days after the petition date or (ii) by an Official Committee of Unsecured Creditors of the Debtor within the sooner of (A) the 60th day after entry of an order approving such committee's engagement of counsel and (B) 90 days after the petition date (as applicable, the "Challenge Period"). **If no such objection is filed during the Challenge Period, the Prepetition Obligations shall be allowed in full as a secured claim within the meaning of Section 506 of the Bankruptcy Code for all purposes in connection with the Debtor's Chapter 11 case, and any and all challenges by any party, including but not limited to challenges under Sections 544, 547 and/or 548 of the Bankruptcy Code, shall be forever barred**. [*Interim Order, at §§ 27, 28*]

- Miscellaneous. The Interim Order contains other terms and conditions customary to an interim bankruptcy court order authorizing debtor-in-possession financing and use of cash collateral, including provisions for modification of the Budget and the DIP Notes, deemed automatic perfection of the DIP Lenders' liens and security interests, and financial reporting. For a thorough understanding of these provisions, it is recommended that one review the attached Interim Order in its entirety.

## VI. Debtor's Attempts to Obtain Credit

11. The Debtor's prepetition financing efforts focused on locating a buyer that would acquire and recapitalize the company. Those efforts, as detailed above and in the Debtor's sale motion, have now resulted in the Proposed Sale. The Debtor believes that the Prepetition Lender and the Purchaser—the two entities who stand to benefit most immediately from consummation of the Proposed Sale—are the only entities that can reasonably be expected to fund the Debtor's Chapter 11 case. Notably, any hypothetical lender would almost certainly require priming liens, and the Debtor has no reason to believe that the Prepetition Lender would consent to such priming liens or that the Debtor could establish that it could provide adequate protection to the

14

Prepetition Lender in connection with any such priming liens.  The Debtor believes that the Prepetition Lender, who had been funding the Debtor's operating losses prepetition, and the Purchaser, who will credit its postpetition loan against its purchase price for the Debtor's assets, are the only viable funding source for the Debtor.  In light of the Debtor's prepetition sale effort, its illiquidity, and the almost certain Prepetition Lender opposition to any proposed priming of its liens other than as agreed with the Purchaser, the Debtor does not believe that there is any viable financing source other than the DIP Lenders, much less one that would offer financing on terms as favorable as the DIP Notes, with their five percent (5%) interest rate.  The Debtor submits that under the circumstances, the DIP Lenders provide the only available source of financing that will enable the Debtor to maintain operations, administer its Chapter 11 case, and pursue this Court's approval of the Proposed Sale.

## VII.  Notice

12. Once the Court schedules a hearing to consider the interim relief sought by this motion, the Debtor will provide notice of such hearing and a copy this motion to the United States Trustee, the DIP Lenders, other entities holding liens against the Debtor's assets, and the 20 largest unsecured creditors of the Debtor as set forth in the list filed by the Debtor pursuant to Fed. R. Bankr. P. 1007(d).  The Debtor submits that such notice is appropriate of this motion and of the initial hearing on this motion.

## Conclusion

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter an order, in substantially the form attached as Exhibit B, granting this motion on an interim basis; (b)

schedule a final hearing on this motion to be held by no later than July 21, 2023; and (c) grant such other and further relief as this Court may deem just and proper.

Dated:  June 29, 2023                         VANTAGE TRAVEL SERVICE, INC.

By its attorneys,

*/s/ A. Davis Whitesell*
Michael J. Goldberg (BBO #551869)
A. Davis Whitesell (BBO #551462)
Casner & Edwards, LLP
303 Congress Street
Boston, MA  02210
Tel: 617-426-5900
Email: goldberg@casneredwards.com
            whitesell@casneredwards.com

## List of Exhibits

Exhibit A—Budget  [*filed as attachment separately*]

Exhibit B—Proposed Interim Order [*filed as attachment separately*]

Exhibit C—Purchaser DIP Note  [*filed as attachment separately*]

Exhibit D—HRL Trust DIP Note [*filed as attachment separately*]