**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | **Chapter 11** |
| | ) | |
| **VANTAGE TRAVEL SERVICE, INC.,** | ) | **Case No. 23-11060** |
| | ) | |
| Debtor. | ) | |
| | ) | |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR**
**APPOINTMENT OF A CHAPTER 11 TRUSTEE OR, ALTERNATIVELY,**
**CONVERSION TO A CASE UNDER CHAPTER 7**
**[Emergency Determination Requested]**

The Official Committee of Unsecured Creditors of Vantage Travel Service, Inc. (the "Committee") files this motion (the "Motion") requesting entry of an order appointing a disinterested individual to serve as a chapter 11 trustee of Vantage Travel Service, Inc. (the "Debtor") or, alternatively, to convert this case to a case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). There is no appreciable daylight between the Debtor and its owner/lender entities, Mr. Henry R. Lewis ("Mr. Lewis") and the Henry R. Lewis Trust u/d/t dated September 23, 2004 (the "Trust" and together with Mr. Lewis, the "Owner/Lender Entities"), and the Committee has lost confidence in the ability of the Debtor's management to operate independently from the Owner/Lender Entities.

**PRELIMINARY STATEMENT**

1.     The Committee requests that this Court appoint a chapter 11 trustee for cause under section 1104(a)(1) of the Bankruptcy Code and because it is in the best interests of the estate and its stakeholders under section 1104(a)(2) of the Bankruptcy Code. The Committee makes this request based on the belief that the Debtor's management is not acting independently of the Owner/Lender Entities and, instead, is acting in the Owner/Lender Entities' interests to the

detriment of the estate and creditors.

2.        All chapter 11 cases have inflection points.  However, since appointment of the Committee, this case has moved from crisis to crisis by virtue of the Owner/Lender Entities' threats to seek conversion to a case under chapter 7 if their self-serving demands were not met— and the Debtor's apparent acquiescence to this.  Like clockwork, a demand would be made upon threat of conversion before whatever hearing was coming next, creating a "crisis of the moment" manufactured by the Owner/Lender Entities, with the Debtor doing their bidding.  This strategy first tainted cash collateral negotiations and is now overwhelming plan development and solicitation.  If it is permitted to continue, then it will harm the interests of all creditors other than the Owner/Lender Entities, who will benefit from a quick chapter 11 plan process handing over property that they are not entitled to have.  This Motion must be granted to remove the Debtor from possession, end the Owner/Lender Entities' domination of the Debtor and this case, and install a fiduciary to oversee distribution of assets as provided for under the Bankruptcy Code— not in blind obedience to the Owner/Lender Entities.

3.        Lastly, the Committee requests that this Motion be determined on an emergency basis.  There is no business deal resolving the Committee's pending objection to solicitation of the pending chapter 11 plan.  A challenge to the Owner/Lender Entities' alleged secured claim is almost certain (as discussed below).  Confirmation is unlikely to occur on the timetable demanded by the Owner/Lender Entities.  And continued efforts to pursue the Debtor's misguided path confirming the Owner/Lender Entities' chapter 11 plan will lead to waste of estate assets. Hearing this Motion on an emergency basis would, if the Motion is granted, save estate resources by bringing a prompt end to useless proceedings whose aim is to benefit the Owner/Lender Entities.

23161122.v1

## JURISDICTION, VENUE, AND STATUTORY BASIS FOR RELIEF

4.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

5.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

6.     Venue is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The statutory basis for relief includes sections 1104 and 1112 of the Bankruptcy
Code and Rules 1017 and 2007.1 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

8.     On June 29, 2023 (the "Petition Date"), the Debtor filed a voluntary petition with
this Court commencing this case.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code,
the Debtor continues to manage its business and financial affairs as a debtor-in-possession.

9.     The United States Trustee (the "UST") did not appoint an official committee of
unsecured creditors in this case (the "Committee") in a final form until August 8, 2023.  The
Committee is comprised of five creditors.  Four are former customers of the Debtor and one is a
trade creditor.  The Committee has adopted by-laws and conducted meetings relevant to its
business and affairs.

10.     The Committee has considered the facts and circumstances related to the relief
requested in this Motion at a meeting attended by all members of the Committee.  The Committee
considered the benefits and disadvantages of filing this Motion and ultimately determined, in its
business judgment, that filing this Motion was in the best interests of general unsecured creditors.

11.     The Committee was formed later than is typical and, therefore, did not participate
in many key events prior to its formation.  This includes proceedings related to the Debtor's initial
request for secured financing and use of cash collateral [Dkt. No. 7] (the "Financing Motion"), a
motion to establish bidding and marketing procedures [Dkt. No. 6] (the "Sale Procedures
Motion"), a motion to sell substantially all assets [Dkt. No. 3] (the "Sale Motion" and together

with the Financing Motion and Sales Procedures Motion, the "Key First Day Motions"), or, among other things, an auction of the Debtor's assets (the "Auction"). The Debtor supported the Key First Day Motions with a declaration of its chief operating officer Gregory Del Greco [Dkt. No. 14] (the "Del Greco Declaration") and a declaration of an investment banker apparently retained by the Owner/Lender Entities [Dkt. No. 15] (the "I-Banker Declaration" and together with the Del Greco Declaration, the "Declarations"). Reference is made to the Key First Day Motions, the Declarations, and the allegations set forth therein.

12.     On July 26, 2023, the Court entered the second interim financing order [Dkt. No. 145] (the "Second Interim Order") pursuant to which the Owner/Lender Entities disclaimed a prepetition security interest in funds of customers paid to the Debtor on and after May 12, 2023—namely funds in the amount of $2,119,139.81 held in a deposit account titled to the Debtor with JP Morgan Chase Bank in an account ending in 7629 and disclosed in the Debtor's Statement of Financial Affairs filed on July 21, 2023 [Dkt. No. 109, p. 140, item 21] (the "Customer Deposit Funds"). Additionally, the Debtor has asserted that the Customer Deposit Funds are not property of the estate even though its Sale Motion proposed selling such funds and notwithstanding the Debtor's historical practice of depositing funds from customers in its operating account(s) for use as working capital.

13.     On July 31, 2023, the UST filed an emergency motion seeking to appoint a trustee or convert this case to one under chapter 7 [Dkt. No. 162] (the "UST Trustee Motion"). The UST Trustee Motion is incorporated herein. The UST contended, among other things, that the Debtor was moving too quickly to sell its assets and had manufactured a cash availability crisis by taking the position that Customer Deposit Funds were excluded from the estate under section 541(b) of the Bankruptcy Code in the absence of facts supporting such a conclusion.

14.     On August 3, 2023, JPMorgan Chase Bank, N.A. filed an objection to the Sale

Motion [Dkt. No. 189] (the "JPM Objection") also asserting that the Customer Deposit Funds were not subject to a trust or excluded from the Debtor's estate.

15.     On August 8, 2023, the Debtor filed a reply [Dkt. No. 222] to pending objections to the Sale Motion informing parties that the Customer Deposit Funds would not be sold pending a determination of rights.

16.     On August 25, 2023, the Committee filed an objection to the UST Trustee Motion [Dkt. No. 321].  The Committee had recently been formed and, at that time, believed that there was a reasonable prospect that the parties could work together to cost-effectively resolve disputes in this case in a value-maximizing manner for all parties.  Such objection was based on the limited information known to the Committee, as it had not yet received any diligence materials from the Debtor.

17.     Since that time, the Committee has lost confidence in the Debtor's management and its ability to operate independently of the Owner/Lender Entities.  The following allegations review the reasons for this.  They are not an attempt to obtain judicial relief as to the issues raised but the facts and circumstances are directly relevant to why there is cause to appoint a trustee and why it is in the best interests of stakeholders that an independent fiduciary be appointed.

**Cash Collateral**

18.     The Court is aware that cash collateral negotiations moved in fits and starts.  This resulted in entry of a final cash collateral order on September 19, 2023 [Dkt. No. 379] (the "Cash Collateral Order").

19.     The primary point the Committee wishes to bring to the Court's attention is that the Owner/Lender Entities manufactured crisis after crisis during these negotiations with the constant threat of conversion, which would have prevented the Committee from beginning any substantive work.  The Owner/Lender Entities further threatened conversion unless the

23161122.v1

Committee agreed to stop most of its investigative activity (with a promise to preserve the Committee's investigative rights). The Debtor acquiesced to the Owner/Lender Entities' strategy and also apparently delayed production of key documents directly relevant to cash collateral negotiations—namely the loan and security documents between the Debtor and Owner/Lender Entities, which significantly hampered the Committee.

20.     The Committee made the business decision to continue in those negotiations based on the determination that general unsecured creditors benefited from the Committee's work commencing and with the expectation that there would subsequently be substantive and meaningful plan negotiations in the hope of a quick resolution to this case. The Committee is not seeking to "retrade" that deal in this Motion but notes that negotiations over cash collateral, including the Debtor's acquiescence to self-serving demands of the Owner/Lender Entities, contributed to the Debtor's lack of confidence that the Debtor's management is independent from the Owner/Lender Entities. Certainly, the Debtor participated in discussions—but the Committee could discern little daylight between the Debtor and the Owner/Lender Entities.

## **Production of Documents and Information**

21.     The Committee has encountered significant difficulty obtaining access to documents and information that the Committee believes are reasonably necessary for it to complete its Perfection Challenge (as defined in the Cash Collateral Order), to address certain potential confirmation issues, and to fulfill its statutory duties under section 1103 of the Bankruptcy Code. The difficulties that the Committee has encountered have caused it to lose confidence in the Debtor's management and its independence from the Owner/Lender Entities.

22.     First, the Committee's initial written request to the Debtor for copies of loan and security documents with the Owner/Lender Entities was made on August 31, 2023. Despite subsequent request, certain of these documents were not provided until September 18, 2023—

23161122.v1

after the hearing approving entry of the Cash Collateral Order—and others were provided after a

hearing held September 26, 2023 (the "Sept. 26 Hearing") in which the Court advised that it

would grant an emergency motion for shortened discovery.  Among these documents are four

promissory notes, including the pending amended and restated promissory note.  These

documents are collectively attached hereto as **Exhibit A** (the "Notes").  Also among these

documents is the document alleged to be a security agreement granting a security interest to

secure obligations under the Notes (the "Security Agreement"), a copy of which is attached as

**Exhibit B**.  Based on the Notes and the Security Agreement, it appears that on or about October

12, 2022, within one year prior to the Petition Date, the Owner/Lender Entities caused the Debtor

to execute an amended and restated promissory note rolling up any advances by affiliates to the

Debtor into the promissory note delivered to the Owner/Lender Entities—and making previously

unsecured debt a secured obligation.  The Committee is not aware of any prior disclosure of this

information to the Court—even though the Debtor's cash collateral stipulation [Dkt. No. 376]

(the "Cash Collateral Stipulation") waived claims against any affiliates related to the Prepetition

Debt (as defined in the Cash Collateral Stipulation).

23.    Second, late on September 7, 2023, the Committee sent robust and detailed

document requests.  The Committee did so because it understood that the Debtor intended to

propose a chapter 11 plan that would provide releases of claims against the Owner/Lender

Entities[1] in a chapter 11 plan process that was, regardless of the Committee's view, going to be

expedited.  No documents were produced—not even those that would now indisputably be within

the scope of the Perfection Challenge (as defined in the Cash Collateral Order).  Instead, as the

Court is aware, the Owner/Lender Entities did an about-face 24 hours prior to a hearing on

---

[1]    From the start, the Owner/Lender Entities have taken the position that it would violate Rule 11 to ever bring
a claim against the Owner/Lender Entities.

23161122.v1

September 13, 2023, threatening conversion unless the Committee agreed to forego most investigative work.

24.     Third, on September 21, 2023, the Committee again asked for production of documents previously requested, though the Committee removed several requests, thereby reducing the scope of what was to be produced.  The Committee believes that these requests were necessary for its Perfection Challenge (as defined in the Cash Collateral Order), issues that appeared (and now appear) likely to be material to plan confirmation (*e.g.* the status of the Customer Deposit Funds, which also bears on good faith), and fulfillment of the Committee's duties under section 1103 of the Bankruptcy Code.  About two hours before the Sept. 26 Hearing, the Debtor informed the Committee that it had simply been too busy to provide the majority of information requested due to pressing matters in this case.  Following the Sept. 26 Hearing and further written communications, the Debtor began production of many documents.  The Sharefile site used to transmit such documents indicates the date on which they were uploaded.  A screen shot with such dates is attached as **Exhibit C**.  The overwhelming majority of the documents that the Debtor was too busy to produce appear to have been uploaded weeks ago, thereby depriving the Committee of valuable time to fulfill its duties under section 1103 of the Bankruptcy Code and related to the Perfection Challenge.

25.     The Committee is not seeking to turn this Motion into a vehicle for a discovery dispute.  Rather the Committee brings this information to the Court's attention because it has contributed to the Committee's loss of confidence in the Debtor's management and its independence from the Owner/Lender Entities.

## Customer Deposit Funds

26.     The Debtor's statements to the Court at the Sept. 26 Hearing bring an end to the need for any further diligence by the Committee on the status of the Customer Deposit Funds.

23161122.v1

The Debtor has now unequivocally stated that its position that the Customer Deposit Funds are not property of the estate is based on undisclosed legal theories—not documents evidencing the intent of a settlor.  The Debtor's undisclosed legal theories have inverted the basic presumption that funds in a deposit account titled to the Debtor are the Debtor's property.  *In re FBI Wind Down, Inc.*, 581 B.R. 116, 130 (Bankr. D. Del. 2018) ("It is 'well-settled case law' that any bank accounts under the legal title of the debtor, as well as any deposits in such accounts credited to the debtor, are presumptively considered property of the debtor's estate.")  This has and will continue to lead to unnecessary legal proceedings and expense.

27.     In the meantime, the Committee has analyzed the status of the Customer Deposit Funds and been unable to identify an argument that could plausibly support the Debtor's secret theory.  There is no basis to assert that the funds are impressed with a trust under Massachusetts law or are otherwise excluded from the estate under prevailing bankruptcy law.  The Committee has set forth these legal arguments in paragraphs 50 through 61 below for the reason that the Debtor's unfounded legal positions and the impact they are having in this case are another ground to find cause to appoint a trustee.

## Chapter 11 Plan

28.     Thus far, the Committee has had virtually no participation in preparation of any plan-related documents.  The Committee was not provided a copy of any disclosure-related documents (the "Disclosure Statement" [Dkt. No. 383] and the "Plan Supplement" [Dkt. No. 384] and together, the "Disclosure Documents") prior to their being filed after 4 p.m. on Thursday September 21, 2023.  While the Committee was provided a draft copy of a liquidating plan [Dkt. No. 382] (the "Plan" and together with the Disclosure Documents, the "Plan Documents") about 48 hours before it was filed on Thursday afternoon, there was no opportunity for input, discussion,

9

or negotiation prior to filing, despite the Committee making itself available.[2]    The Committee

was provided a revised version of the Plan for the first time at 5:50 p.m. on Thursday September

28, 2023—along with a revised proposal to resolve the Committee's objection to solicitation.[3]

29.    There are numerous aspects of the chapter 11 plan process and contents of plan

documents that caused the Committee to lose confidence in the Debtor's independence from the

Owner/Lender Entities and have led the Committee to the conclusion that the Plan, which is

unconfirmable, was crafted for the benefit of the Owner/Lender Entities' economic interests.

30.    From a process standpoint, the break-down in negotiations at the Sept. 26 Hearing

was over the demand by the Owner/Lender Entities that the case be converted unless the

Committee withdraw its objection to solicitation (without any indication of the Committee's

position in the Disclosure Documents) and agree not to tell general unsecured creditors to vote

against the Plan.    In exchange, the Owner/Lender Entities proposed a guaranteed amount of

funding for the creditor trust under the Plan.    The Committee has determined that this proposal

was not consistent with the Committee's duties to general unsecured creditors and subsequently

voted to authorize the filing of this Motion.

31.    As a substantive matter, the Plan is also further demonstration that the Debtor is

doing the Owner/Lender Entities' bidding rather than exercising fiduciary duties for all creditors.

The Plan treats the Owner/Lender Entities' claim as secured and would authorize distribution of

estate property in satisfaction of the secured claim.    Based on review of documents provided by

the Debtor and publicly available documents, there are obvious and significant perfection issues

---

[2]    In addition, an intervening Jewish religious holiday has made counsel for the Committee and the
Committee's chairman (and perhaps others) unavailable for one of the two business days between the time the Plan
Documents were filed and the hearing to authorize disclosure and solicitation.    Thus, the Committee had a single
business day to consider the Plan and Disclosure Documents prior to the Sept. 26 Hearing.
[3]    Without getting into details, this is yet another example of an offer being made at a hearing with an
understanding that the Committee would consider it and respond only to be withdrawn and replaced with a worse
proposal before the next hearing.

that should not be ignored, including:

- On December 22, 2021, the Debtor entered into a security agreement naming Paul Gaugin Shipping Limited as secured party.  This is the Security Agreement previously attached as **Exhibit B**.

- On December 22, 2021, a financing statement was filed naming Paul Gaugin Shipping Limited as secured party (the "Gaugin Financing Statement").  A copy of the Gaugin Financing Statement is attached as **Exhibit D**.

- On November 7, 2022, the Gaugin Financing Statement was purportedly assigned to the Trust pursuant to a UCC financing statement amendment (the "Gaugin Assignment").  A copy of Gaugin Assignment is attached as **Exhibit E**.  Line 24 identifies Mr. Lewis, individually, as an assignor—not an additional secured party or assignee.  Assuming that the Gaugin Financing Statement and Gaugin Assignment perfected and assigned a security interest, the Trust might be a secured party of record but Mr. Lewis is not.

- On December 22, 2021, a financing statement was filed naming "PGSL" as secured party (the "PGSL Financing Statement").  A copy of the PGSL Financing Statement is attached as **Exhibit F**.  There are no UCC financing statement amendments assigning the PGSL Financing Statement to any other party.  Thus, to the extent the PGSL Financing Statement perfects a security interest in favor of any party (it does not), PGSL remains the secured party of record.

- There is no such entity as Paul Gaugin Shipping Limited.  In 2009, Paul Gaugin Shipping Limited changed its name to PGSL.  A copy of the Certificate of Incorporation on Change of Name, as provided by the Debtor (but not independently verified) is attached as **Exhibit G**.

32.     Applicable law holds that a financing statement omitting the actual name of the secured party is ineffective to perfect a security interest.  *In re Clarence Graphics, Inc.*, 201 B.R. 46, 46 (Bankr. W.D.N.Y. 1996) (individual creditor failed to perfect lien on assets of debtor where financing statement failed to identify him as secured party and instead identified the corporation owned by the individual creditor and where claim of individual creditor was distinct from that of corporation); *In re Copper King Inn, Inc.*, 918 F.2d 1404, 1408 (9th Cir. 1990) (creditor's financing statement held insufficient to perfect security interest because it did not list all of the secured parties involved).  As noted by the Ninth Circuit:

As the bankruptcy court recognized, the omission of a creditor's name could be

seriously misleading, especially in situations like the one presented here, where officers and shareholders in the debtor company are also its creditors. Potential lenders have a special interest in knowing the identity of such creditors because of the obvious possibility that the insider relationship may lead to collusive behavior that could disadvantage them. Though the financing statement in this case indicated the full amount of debt, it did not disclose the true source of the credit. Noonan's own name was listed, but his company, John T. Noonan Pension & Profit Sharing Plans, and its trustee, Northwest, were nowhere mentioned. The existence of these shadow entities would have been highly significant to anyone contemplating a loan to Copper King. In view of the commercial realities of this case, we find the financing statement was seriously misleading.

*Id.* at 1408.

33.    The Plan also favors the Owner/Lender Entities by virtue of its assignment and transfer of an insurance claim and related proceeds stemming from a cyberattack to the Owner/Lender Entities when the Owner/Lender Entities have taken no steps to perfect a security interest in such property other than filing a financing statement. The Committee informed the Debtor that this is insufficient for perfection. *Wheeling & Lake Erie Railway Co. v. Robert J. Keach, Chapter 11 Trustee (In re Montreal, Maine & Atlantic Railway, Ltd.)*, 799 F.3d 1 (1st Cir. 2015).

34.    Further, the Plan proposes to use Customer Deposit Funds to satisfy alleged claims of JPMorgan Chase Bank ("JPM"). JPM alleged in the JPM Objection that Mr. Lewis has personally guaranteed any obligations of the Debtor to JPM—thus the Debtor's about-face on Customer Deposit Funds directly benefits Mr. Lewis.

35.    This Motion is not intended as a confirmation objection. However, the Debtor's Plan included these provisions favorable to the Owner/Lender Entities, to the detriment of other creditors, but did not adequately provide for treatment of the interests of customers and trade vendors, simply lumping them in a common class and punting.

### Lack of Trust and Confidence

36.    At the Sept. 26 Hearing, counsel for the Owner/Lender Entities reported to the

Court that there was a lack of trust with the Committee.  This is mutual.  The Committee lacks confidence that there can be meaningful or productive negotiations with the Owner/Lender Entities controlling the Debtor and believes that a trustee must be appointed.

**RELIEF REQUESTED**

37.     Pursuant to sections 1104 and 1112 of the Bankruptcy Code, the Committee requests that the Court remove the Debtor from possession and appoint a trustee or, alternatively, convert this case to one under chapter 7 for cause.

**BASIS FOR RELIEF**

**I.      The Court Should Appoint a Trustee**

      **A.      General Standards for Appointing a Chapter 11 Trustee**

38.     A debtor-in-possession owes fiduciary duties to its creditors and the bankruptcy estate. *In re Morningstar Marketplace, Ltd*., 544 B.R. 297, 303 (Bankr. M.D. Pa. 2016) (citing *In re Marvel Entm't. Corp.*, 140 F.3d 463, 471 (3d Cir. 1998)); *see also In re Thomas*, 596 B.R. 350, 360 (Bankr. W.D. Tenn. 2019) ("The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.") (internal quotations and citation omitted).  As a fiduciary, the debtor-in-possession's obligations "include a duty of care to protect the [estate's] assets, a duty of loyalty and a duty of impartiality." *In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010).

39.     The rights of a debtor-in-possession, however, are not absolute and must be forfeited if these fiduciary duties are neglected. *See id.* (collecting cases).  Although courts will presume "that the debtor-in-possession should be permitted to remain in control of the corporation absent a showing of need for the appointment of a trustee," *see In re Thomas*, 596 B.R. at 359 (quoting *In re Nartron Corp.*, 330 B.R. 573, 591 (Bankr. W.D. Mich. 2005)), "[t]his

13

presumption is based on the fact[] that the debtor in possession has a strong sense of familiarity with the business" and is able to perform its fiduciary duties. *See id*. at 359–60 (internal quotations and citation omitted).

40.    Section 1104 of the Bankruptcy Code empowers a party in interest, like the Committee, to seek the appointment of a chapter 11 trustee for "cause" *or* because such appointment would serve the "interests of the estate," including its creditors. *See* 11 U.S.C. § 1104(a).  The statute provides as follows:

> [a]t any time after the commencement of the case but before confirmation of a plan, on request of a party in interest … and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*Id*.

41.    "[T]he question of whether a trustee should be appointed in a Chapter 11 case must be considered by the court on a case-by-case basis considering a totality of the particular facts and circumstances …." *In re Thomas*, 596 B.R. at 360.  Courts are afforded discretion to determine whether grounds exist for the appointment of a chapter 11 trustee; however, if the court determines that such grounds exist, the court "shall order the appointment of a trustee." *See* 11 U.S.C. § 1104(a); *see also In re Thomas*, 596 B.R. at 360, 363.  Such a determination should be made based on a preponderance of evidence.  *Tradex v. Morse*, 339 B.R. 823, 826 (D. Mass.

2006).

**B.**    **Appointing a Trustee for "Cause" Pursuant to 11 U.S.C. § 1104(a)(1)**

42.    Section 1104(a)(1) provides a list of examples that constitute "cause" for the appointment of a trustee, including "dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case …." *See* 11 U.S.C. § 1104(a)(1).  However, according to the First Circuit:

> The inquiry into whether cause exists for the appointment of a chapter 11 trustee is not limited to the enumerated list but extends to "similar cause."  *See* 11 U.S.C. § 1104(a)(1).  In determining whether a particular set of circumstances establishes cause under this prong of § 1104(a), courts have considered a variety of factors, including: (1) Materiality of the misconduct; (2) Evenhandedness or lack of such in dealings with insiders or affiliated entities vis-a-vis other creditors or customers; (3) The existence of pre-petition voidable preferences or fraudulent transfers; (4) Unwillingness or inability of management to pursue estate causes of action; (5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties owed to the debtor; [and] (6) Self-dealings by management or waste or squandering of corporate assets . . . While any one factor may not warrant appointment of a trustee, the court must consider the cumulative or collective impact of the alleged problems or issues in making its decision . . . That is, the court must determine whether the totality of the circumstances warrant appointment of a trustee . . .

*United Surety & Indemnity Co. v. Lopez-Munoz (In re Lopez-Munoz)*, 553 B.R. 179, 190 (B.A.P. 1st Cir. 2016) (denying request for the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1)), *affirmed*, *United Surety & Indemnity Co. v. Lopez-Munoz (In re Lopez-Munoz)*, 866 F.3d 487 (1st Cir. 2017) (citations and internal punctuation omitted).  *See also In re Thomas*, 596 B.R. at 360–61 (quoting *In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013)); *see also In re Nartron Corp.*, 330 B.R. at 592 (identifying factors).

43.    Often, the thread underlying each of the "cause" factors is the presence of "irreconcilable conflicts and acrimony between the debtor and creditors" such that "the appointment of a trustee to act as a neutral and efficient fiduciary [is] appropriate …." *In re Thomas*, 596 B.R. at 361 (citing *Marvel Entm't*, 140 F.3d at 472-74).  Specifically, when "there

is no reasonable likelihood of any cooperation among the [debtor and the estate's constituents] in the foreseeable future, and the parties have been working at cross-purposes," the risk of a "large messy bankruptcy that promises to get worse [warrants] a disinterested administrator at the helm." *See id*. at 361, 362 (internal quotations and citations omitted). Otherwise, the function and purpose of a chapter 11 case will be undermined. *See id*. at 362 ("These rules shall be construed, *administered, and employed by the court and the parties* to secure the just, speedy, and inexpensive determination of every case and proceeding.") (quoting FED. R. BANKR. P. 1001) (emphasis in original).

### C.  Appointing a Trustee in the Interests of the Estate Pursuant to 11 U.S.C. § 1104(a)(2)

44.  Section 1104(a)(2) provides an additional basis for the appointment of a chapter 11 trustee that is less stringent and more "flexible," and affords the Court more discretion. *See In re Thomas*, 596 B.R. at 362; *In re Wings Digital Corp.,* No. 05-12117, 2005 WL 3789334, at *5 (Bankr. S.D.N.Y. May 16, 2005). As an alternative ground for appointing a chapter 11 trustee, the court is not required to find "cause." *See Sharon Steel,* 871 F.2d at 1226; *see also In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). The flexible standard embodied by section 1104(a)(2) is "'intended to accommodate two goals: (1) facilitation of the debtor's reorganization; and (2) protection of the public interest and of creditors.'" *In re Thomas*, 596 B.R. at 362–63 (quoting 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3][a]).

45.  Section 1104(a)(2) affords courts "discretion to appoint a trustee when doing so would serve the parties' and the estates' interests." *In re Ashley River Consulting, LLC,* No. 14-13406, 2015 WL 1540941, at *11 (Bankr. S.D.N.Y. Mar. 31, 2015) (quoting *In re Marvel,* 140 F.3d at 474). This is a fact-driven analysis under the Court's broad equity powers. *See, e.g., In re Soundview Elite, Ltd.,* 503 B.R. 571, 582-83 (Bankr. S.D.N.Y. 2014). When evaluating

appointment of a trustee under the "best interest" prong, the Court should "eschew rigid absolutes

and look to the practical realities and necessities," *In re Hotel Associates, Inc.,* 3 Bankr. 343, 345

(Bankr. E.D. Pa. 1980), by considering the following four factors:

      (a)     the trustworthiness of the debtor;
      (b)     the debtor's past and present performance and prospect for rehabilitation;
      (c)     the lack of confidence among creditors in the debtor's management; and
      (d)     whether the benefits of a chapter 11 trustee outweigh the costs.

*In re Thomas*, 596 B.R. at 363; *In re Soundview Elite,* 503 B.R. at 583 (same); *In re Colorado-*

*UTE Electric Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (same).

      46.     At bottom, section 1104(a)(2) embraces a remedy to ensure that the bankruptcy

system functions properly and the rights of the estate's constituents are adequately balanced

against the rights of the debtor; "that is, whether the benefits to all interests of the estate that

would come from the appointment of a chapter 11 trustee outweigh the detriment of the estate."

*In re Thomas*, 596 B.R. at 363.

## II.    The Court Should Appoint a Trustee for "Cause"

      47.     Many of the circumstances courts consider in a "cause" analysis are present in this

case.  The Committee addresses them below.

### The Debtor is Treating Insiders Better Than Other Creditors and Failing to Properly Exercise its Fiduciary Duties for All Creditors

      48.     Upon information and belief, the Debtor's management is beholden to the

Owner/Lender Entities and is unable to act independently at this point in the case for the reasons

described above, which are summarized as follows:

- The Debtor has acquiesced in the Owner/Lender Entities' "crises of the moment" approach to negotiations.

- The Debtor has stipulated to the validity of obviously defective secured claims **after** the sale was completed and **after** the Owner/Lender Entities waived any prepetition security interest in the Customer Deposit Funds, pursuant to the Second Interim Order.

23161122.v1

- The Debtor has proposed a Plan that would distribute assets to the Owner/Lender Entities when there are serious perfection issues with the Owner/Lender Entities' alleged secured claim.

- The Debtor has proposed a Plan that would distribute the cyberattack insurance claim and its proceeds to the Owner/Lender Entities even though such asset is not subject to a valid prepetition security interest.

- The Debtor's Plan utilizes Customer Deposit Funds in a manner that personally benefits Mr. Lewis.

- The Debtor withheld vital documents from the Committee during cash collateral negotiations—namely the loan documents purporting to make the Debtor liable to the Owner/Lender Entities on account of a secured claim for unsecured claims of affiliates within one year of the Petition Date.

### The Existence of Prepetition Voidable Preferences

49.     Upon information and belief, within one year of the Petition Date, the Notes were amended and restated to make the Debtor obligated to the Owner/Lender Entities for advances of affiliates—and, to the extent that the Notes and Security Agreement created valid, perfected, first priority security interests, this provided security for otherwise unsecured obligations of the Debtor. This constitutes a prepetition voidable preference and may also be a fraudulent transfer to the extent that there was a lack of reasonably equivalent value provided by the Owner/Lender Entities to secure advances made to affiliates.

### Unfounded Positions Regarding Customer Deposit Funds

50.     It is now clear that there are no documents identified in support of the Debtor's assertions that the Customer Deposit Funds are not property of the estate. Consequently, the Debtor's assertion of as-yet-undisclosed legal theories has led to unnecessary waste of time and expense in the case. It removed from the Debtor's reach an important potential source of liquidity and permitted the Debtor and Owner/Lender Entities to proceed with representations to this Court that the Debtor could only get through chapter 11 on a timetable that simply does not make sense.

23161122.v1

A compressed schedule favors the Owner/Lender Entities in their effort to stream-roll past the Committee, to the detriment of other creditors.

51.     By way of elaboration, section 541(b) provides that "[p]roperty of the estate does not include… any power that the debtor may exercise solely for the benefit of an entity other than the debtor."  11 U.S.C. § 541(b)(1).  In construing section 541, courts almost universally hold that trust property is outside of the bankruptcy estate.  *See Begier v. I.R.S.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *In re Lan Tamers, Inc.*, 281 B.R. 782, 792 (Bankr. D. Mass. 2002) (same); *In re Raymond Renaissance Theater, LLC*, 583 B.R. 735, 744 (Bankr. C.D. Cal. 2018) ("[T]o determine whether a debtor holds property in trust for another, the court must first look to applicable state law to see whether or not an enforceable trust exists.").

52.     It is less clear under what circumstances that non-trust property may be excluded from a bankruptcy estate pursuant to section 541(b)(1).  Broadly speaking, "[t]he 'power' referred to in section 541(b)(1) of the Code means an actual power."  5 Collier on Bankruptcy P 541.17 (16th 2023).  More specifically, "if the power in question may be exercised for the benefit of another entity, but is capable of conferring benefit on the debtor also, it becomes property of the estate."  *Id.*

53.     Under Massachusetts law, trusts have been classified into two categories.  First, there are voluntary trusts, which are described as express trusts which spring from the agreement of the parties.  Patricia M. Annino, *Probate Law and Practice*, Part III Trusts, Chapter 37, Nature and Kinds of Trusts, June 2023, 22 Mass. Prac., Probate Law and Practice § 37:1 (3d ed.).  "A voluntary trust is one created by a competent settlor with a designated subject matter and with the trustee and beneficiary being named and the duties and limitations of the trust being set forth and declared."  *Id.*  "Second, there are involuntary trusts, which are constructive or resulting, such

as implied trusts which are inferred by the rules and principles of equity." *Id*. Involuntary trusts

are created by principles of equity, notwithstanding that the parties did not intend to create a trust

relationship. *Id*.

54.     Voluntary or express trusts are typically created by written instrument but can also

arise by way of an oral statement proven by parol evidence. *Cooney v. Montana*, 347 Mass. 29,

34, 196 N.E.2d 202, 206 (1964) (express trust found to have been established as to proceeds of

life insurance policy based on conversation). "Whether a trust is created depends primarily upon

the manifestation by the [settlor] of an intention to create a trust." *Ventura v. Ventura*, 407 Mass.

724, 726, 555 N.E.2d 872, 874 (Mass. 1990). "In the case of an express trust… this intention to

separate legal and equitable control over particular property should be 'ascertained from the

language of the whole [trust] instrument considered in the light of the attendant circumstances.'"

*Id*. No particular form of words is necessary to create an express trust, however, the language

used must unequivocally show an intention that the legal estate be vested in one person to be held

in some manner on behalf of another. *Id*.; *Trs. of First Methodist Church of Holyoke v. Attorney

Gen.*, 359 Mass. 658, 660, 270 N.E.2d 905, 906 (Mass. 1971).

55.     However, the Debtor's statements in Court at the Sept. 26 Hearing make clear that

there was no voluntary or express trust, written or otherwise. The Debtor segregated the

Customer Deposit Funds for its own reasons at its own election—contrary to its historical practice

(per testimony of the Debtor's representative at the 341 meeting) of depositing customer funds

into the Debtor's operating account and using them for current operating expenses. Presumably

the Customer Deposit Funds were segregated to mitigate against fraud or other claims rather than

altruism.

56.     Under Massachusetts law, there are two kinds of involuntary trusts, constructive

trusts and resulting trusts. It is unlikely that the Customer Deposit Funds are subject to either

such trust.

57.    Constructive trusts arise by operation of law when the circumstances of a transaction are such that the person who takes the legal title to property cannot also enjoy the beneficial interest without violating some established principle of equity.  While the forms and varieties of constructive trusts are practically unlimited and each case must be considered on its own facts, a constructive trust will not be imposed "[a]bsent fraud, breach of a fiduciary duty or other misconduct[.]" *Collins v. Guggenheim*, 417 Mass. 615, 618, 631 N.E.2d 1016, 1017 (Mass. 1994).  Notwithstanding the inclusion of the broad term "misconduct" in *Collins*, other cases limit the imposition of a constructive trust solely to cases involving a breach of fiduciary duty or the perpetration of actual fraud. *See Lewis v. Mills*, 32 Mass. App. Ct. 660, 666, 593 N.E.2d 1312, 1316 (Mass. App. Ct. 1992) (no trust imposed; the Appeals Court found that "there has been neither a showing that the legal title to the property was obtained by fraud [at the time of the transfer] or in violation of a fiduciary relation"); *Meskell v. Meskell*, 355 Mass. 148, 150, 243 N.E.2d 804, 806 (Mass. 1969).  Moreover, courts have held that "[t]he fraud required to create a constructive trust must occur at the time the property was transferred; a subsequent refusal to carry out an oral promise, standing by itself, is not fraud." *Meskell*, 355 Mass. at 151, 243 N.E.2d at 806; *see also Hazleton v. Lewis*, 267 Mass. 533, 538, 166 N.E. 876, 877 (Mass. 1929).

58.    Unless the Debtor is prepared to take the position that it was in a fiduciary relationship with customers or committed a fraud, it seems implausible that the Debtor bases its legal argument on imposition of a constructive trust.

59.    This leaves a resulting trust.  A resulting trust normally arises when a transfer of property is made to one person and the purchase price is paid by another, in which case a trust results in favor of the person who furnished the consideration.  *Fortin v. Roman Cath. Bishop of Worcester*, 416 Mass. 781, 788, 625 N.E.2d 1352, 1357 (Mass. 1994); *Nessralla v. Peck*, 403

Mass. 757, 763, 532 N.E.2d 685, 689 (Mass. 1989); *Krasner v. Krasner*, 362 Mass. 186, 189, 285 N.E.2d 398, 400 (Mass. 1972). A person who seeks to establish the existence of a resulting trust does so by showing circumstances which demonstrate that the person making or causing a transfer of property did not intend to give the transferee the beneficial interest in the property. *Krasner*, 362 Mass. at 189, 285 N.E.2d at 400. Again, given the Debtor's historical practice of using customer deposits as working capital and the intention of customers to transfer funds to the Debtor (rather than a third party), it is difficult to see how the Debtor could argue today that the Customer Deposit Funds were subject to a resulting trust without conceding that it improperly used them in the past.

60. Finally, while there is little law on how funds not subject to a trust are excluded from a bankruptcy estate, generally speaking, funds received by a debtor are part of the estate unless an irrevocable agreement compels the debtor to use such funds exclusively for another party's benefit. *See Georgia Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 971-972 (5th Cir. 1983); *In re Auto-Train Corp., Inc.*, 810 F.2d 270, 274 (D.C. Cir. 1987) ("courts have uniformly required a contract irrevocably obligating the debtor both to segregate the 'trust funds' from the debtor's own funds and to deliver the 'trust funds' to the creditor… The agreement between Midland-Ross and Railway fails to impose these duties and establishes nothing more than a generic debtor-creditor relationship.") Relatedly, when a debtor receives funds pursuant to an agreement and the debtor fails to provide its required consideration, such funds nevertheless remain property of the estate. *Id*. at 273 ("The argument ignores Midland-Ross's legal claim against Railway for the price. Railway's legal indebtedness obviated any unjust enrichment problem and thus any need for equity to create a constructive trust."). The Committee is not aware of assertions by the Debtor that it received the Customer Deposit Funds under an irrevocable agreement to use such funds exclusively for the benefit of affected customers. If the

Debtor does take this position, then that would raise serious questions about whether the Debtor

has committed a mass fraud through the dissipation of customer deposits over a period of years

(unless documentation changed effective May 12, 2023).

61.     In summary, the Debtor's assertions that the Customer Deposit Funds are outside

the estate appear to be unfounded and nothing more than a matter of convenience.   These

assertions have complicated this case and led to unnecessary proceedings.

### Delayed Production/Withholding of Documents

62.     The Debtor has initially withheld and then delayed production of documents from

the Committee.  The Debtor blamed this on being too busy but **Exhibit C** shows the documents

were uploaded weeks ago.  This has hampered the Committee in completing its work within the

compressed timeframes that the Debtor and Owner/Lender Entities demanded.

### Lack of Confidence in Management

63.     The Committee has lost confidence in the Debtor's management and its ability to

act independently from the Owner/Lender Entities.

### The Current Plan Process is Wasteful

64.     Given the significant issues with the Plan, the Debtor's haste to solicit the Plan

and rush to confirmation appears destined to waste significant amounts of estate resources.  The

Owner/Lender Entities are the only party who benefits from this rushed process.

**III.     The Court Should Appoint a Trustee in the Interests of the Estate and its Creditors**

65.     Alternatively, even if the Court determines that "cause" does not exist for the

mandatory appointment of a chapter 11 trustee, the appointment is in the best interests of the

estate and its creditors.

### The Lack of Confidence Among Creditors

66.     For all the reasons set forth above, the Committee lacks confidence in the Debtor

and its ability to act independently of the Owner/Lender Entities.  This Motion is a vote of no confidence in the Debtor and its management.

## The Debtor Has No Prospect for Rehabilitation

67.     This is a liquidating case—the sale having been completed.  There will be no rehabilitation.  Given that the debtor is liquidating, no particular deference should be paid to its management's judgments regarding the liquidation, and the Committee's views should carry equal, if not superior weight.  *In re Commercial Mortgage and Finance Co*., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (citing *In re S.N.A. Nut Co*., 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995). All that is left is determinations of rights and distributions of assets.  This must occur free from interference by the Owner/Lender Entities.

## At this Time, the Benefits of a Chapter 11 Trustee Outweigh the Costs

68.     While the Committee has made great efforts to advance this case for the benefit of creditors in conjunction with the Debtor, it is clear that the appointment of a trustee best serves the interests of the estate.  The Committee acknowledges the appointment of a trustee will result in additional costs.  However, there are significant attendant benefits worthy of consideration.

69.     First, the Committee understands that the UST has greater flexibility in the selection of a disinterested individual to serve as a trustee in a chapter 11 case and is not required to appoint a panel trustee.  This means that the UST could, with the Committee's input, select a professional who has experience with cases such as this one.  Such an individual is likely to remain as chapter 7 trustee, even if the case promptly converts thereafter.

70.     Second, chapter 11 provides a greater range of options for resolution of key disputes in this case.  By virtue of the Debtor's unfounded and baseless assertion that the Customer Trust Funds are impressed with a trust or otherwise outside of the Debtor's estate, some form of judicial determination of rights is necessary (unless the Court rejects the Debtor's

undisclosed legal theories). There also must be a determination on the manner in which customer travel credits will interact with the claims allowance process. These two issues alone involve thousands of individuals. Leaving these to an ordinary course chapter 7 process could be unwieldly.

71.     Third, the Committee believes that there are significant potential benefits to utilizing a chapter 11 plan to create a post-confirmation structure consolidating a corporate wind-down with creditor trustee functions in a manner that may be more efficient and flexible than the limitations of chapter 7.

72.     While it may be that the Debtor and Owner/Lender Entities identify similar issues to resolve or benefits from chapter 11 as opposed to chapter 7, the Debtor does not appear capable of acting independently from the Owner/Lender Entities—and the Owner/Lender Entities are dominating the Debtor.

## IV.    If the Court Does not Appoint a Trustee, Then the Case Should be Converted to a Case Under Chapter 7

73.     In the event that the Court is not inclined to appoint a chapter 11 trustee, then the Committee requests that the Court convert this case to a case under chapter 7 for "cause" within the meaning of section 1112 of the Bankruptcy Code. The Committee submits that the facts and arguments set forth above demonstrate cause.

## REQUEST FOR EMERGENCY DETERMINATION

74.     As noted above, the Committee requests that this Motion be determined on an emergency basis. The Committee submits that immediate action is necessary to remove the Debtor from possession and end the Owner/Lender Entities' control. At present, there is no business deal resolving the Committee's pending objection to solicitation of the pending chapter 11 Plan. A challenge to the Owner/Lender Entities' alleged secured claim is likely. And

23161122.v1

confirmation proceedings are unlikely to proceed on the schedule proposed. Continued efforts to pursue the Debtor's misguided path confirming the Owner/Lender Entities' chapter 11 plan will only lead to waste of estate assets.

## **CONCLUSION**

Based on the foregoing, the Committee requests that the Court (A) appoint a trustee under section 1104 of the Bankruptcy Code or, alternatively, convert this case to a case under chapter 7, and (B) grant such further and additional relief as the Court deems proper.

Dated: September 29, 2023

*/s/ Andrew C. Helman*
Andrew C. Helman (BBO# 679155)
DENTONS BINGHAM GREENEBAUM LLP
One Beacon Street, Suite 25300
Boston, Massachusetts  02108
(207) 619-0919
andrew.helman@dentons.com

-and-

Gina M. Young (*pro hac vice* pending)
Jacob S. Margolies (*pro hac vice* pending)
Dentons Bingham Greenebaum LLP
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Phone:  (502) 587-3545
gina.young@dentons.com
jacob.margolies@dentons.com

*Counsel for the Official Committee of Unsecured Creditors*

23161122.v1

## CERTIFICATE OF SERVICE

I, Andrew C. Helman, an individual eighteen years of age or older, hereby certify that on the date set forth below, I filed the foregoing document (with exhibits, if any) on the Court's CM/ECF electronic filing system, thereby serving all parties receiving notice and service in this case through the Court's CM/ECF electronic filing system.  Such parties are identified in the following service list:

The following is the list of **parties and attorneys** who are currently on the list to receive email notice/service for this case.

- Eric K. Bradford    Eric.K.Bradford@USDOJ.gov
- Allison L. Carr    acarr@attorneygeneral.gov
- David A Casale    dcasale@reedsmith.com,
  lsizemore@reedsmith.com;jroach@reedsmith.com;slucas@reedsmith.com
- Robert F Casey    bobcasey@robertfcasey.com, bankrupt@robertfcasey.com
- Daniel C. Cohn    dcohn@murthalaw.com, lmulvehill@murthalaw.com
- Joseph M DiOrio    jmdiorio@dioriolaw.com,
  jdiorio@pldolaw.com;aperry@pldolaw.com;mrollinson@pldolaw.com
- Ronald W. Dunbar    dunbar@dunbarlawpc.com
- Michael J. Goldberg    goldberg@casneredwards.com
- Peter J. Haley    peter.haley@nelsonmullins.com, marie.moss@nelsonmullins.com
- Andrew C. Helman    andrew.helman@dentons.com,
  samantha.hayes@dentons.com,tiffany.babcock@dentons.com
- Jonathan Horne    jhorne@murthalaw.com, lmulvehill@murthalaw.com
- Robert J. Keach    rkeach@bernsteinshur.com,
  acummings@bernsteinshur.com;astewart@bernsteinshur.com;kquirk@bernsteinshur.com;aprescott@bernsteinshur.com
- Richard King - B    USTPRegion01.BO.ECF@USDOJ.GOV
- John G. Loughnane    LoughnaneJ@whiteandwilliams.com
- Patrick J. McBurney    pmcburney@pldolaw.com
- John J. Monaghan    bos-bankruptcy@hklaw.com, hapi@hklaw.com
- Sarah E Petrie    sarah.petrie@mass.gov
- Adam Prescott    aprescott@bernsteinshur.com,
  astewart@bernsteinshur.com;kquirk@bernsteinshur.com;sbaker@bernsteinshur.com;12978@notices.nextchapterbk.com;cmastrogiorgio@bernsteinshur.com
- David P. Primack    dprimack@mdmc-law.com, gbressler@mdmc-law.com;scarney@mdmc-law.com
- Cara Sgobba    csgobba@grsm.com
- Heather Sprague    Heather.Sprague@usdoj.gov
- Jeffrey D. Sternklar    jeffrey@sternklarlaw.com,
  jdsternklar@yahoo.com;r60083@notify.bestcase.com;3338331420@filings.docketbird.com
- Melissa L Van Eck    mvaneck@attorneygeneral.gov
- A. Davis Whitesell    whitesell@casneredwards.com,
  luo@casneredwards.com,kohadr97042@notify.bestcase.com

- Harvey J Wolkoff    camillechirillo@quinnemanuel.com,
  erikamorabito@quinnemanuel.com;brittanynelson@quinnemanuel.com
- Lynne B. Xerras    lynne.xerras@hklaw.com
- Gina M. Young    gina.young@dentons.com


Date: September 29, 2023                    */s/ Andrew C. Helman*
                                            Andrew C. Helman (BBO# 679155)
                                            DENTONS BINGHAM GREENEBAUM LLP
                                            One Beacon Street, Suite 25300
                                            Boston, Massachusetts  02108
                                            (207) 619-0919
                                            andrew.helman@dentons.com

23161122.v1

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to this Court's Local Rule 9013-1(g)(C), I certify that I sent an e-mail to Michael Goldberg and Davis Whitesell, as counsel for Vantage Travel Service, Inc., and Robert J. Keach, as counsel for Mr. Henry R. Lewis and the Henry R. Lewis Trust u/d/t dated September 23, 2004, regarding the foregoing motion and that the Committee intends to seek an emergency determination.  I do not know the position of such parties.

Date: September 29, 2023

/s/ Andrew C. Helman
Andrew C. Helman (BBO# 679155)
DENTONS BINGHAM GREENEBAUM LLP
One Beacon Street, Suite 25300
Boston, Massachusetts  02108
(207) 619-0919
andrew.helman@dentons.com

29